UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

                    Plaintiff,

       - against -

GILBERTO NUNEZ,

                    Defendant.
--------------------------------------------------------x

03 Cr. 0670 (CLB)

***Memorandum and Order***

Brieant, J.

      Before this Court for consideration is an application by defendant Gilberto Nunez for resentencing, following a remand from the Court of Appeals for a *Crosby* hearing, held by this Court on April 27, 2006 and fully submitted for decision. The scope of the hearing and our compliance with the Mandate requires the Court to consider certain substantive issues wholly apart from a response to the *Booker* decision.

      Familiarity of the reader with all prior proceedings in this case is assumed. However, certain relevant facts must be set forth in order that this Court's decision on remand may be complete and understood.

      Mr. Nunez was arrested on April 16, 2003 pursuant to a criminal complaint filed in this District. On May 28, 2003 (Doc. 7), he executed a Waiver of Indictment and entered a plea of guilty to a Criminal Information filed on that date.

      The Information charges that on/or about April 15, 2003 in this District, Mr. Nunez, "and

1

others, known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other and others known and unknown to commit offenses against the United States, to wit, to violate Title Eighteen United States Code § 1956(a)(1)."

The Information goes on to charge that it was an object of the conspiracy to conduct and attempt to conduct financial transactions involving the proceeds of narcotics trafficking with the intent to promote the carrying on of a specified unlawful activity in violation of § 1956(a)(1)(A)(I). An additional object of the conspiracy was to conduct such transactions "knowing that the transactions were designed and in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of § 1956(a)(1)(B)(I). The Information went on to charge as means and methods that Nunez and others, known and unknown were engaged in collecting proceeds generated from the sale of narcotics, would bundle those narcotics proceeds in large bags and suitcases and then deliver them to other persons in order to disguise the unlawful origin of such narcotics proceeds.

The Information alleged two overt acts as follows:

a. On or about April 15, 2003, GILBERTO NUNEZ, the defendant, drove his car to a gas station on Route 87 in Yonkers, and there received , from a co-conspirator, a suitcase containing approximately $414,060 in cash proceeds of narcotics trafficking, which NUNEZ then took to his home.

b. On or about April 15, 2003, GILBERTO NUNEZ, the defendant, drove his car a second time to a gas station on Route 87 in Yonkers, and there received, from a co-conspirator, two duffel bags containing a total of approximately $649,433

in cash proceeds of narcotics trafficking.

Subparagraph 1956 (h) of the relevant statute reads as follows:

> Any person who conspires to commit any offense defined in this Section or § 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

On May 28, 2003, Mr. Nunez appeared before the Hon. Mark D. Fox, United States Magistrate Judge and pled guilty to Count 1 of the Information. The transcript (Doc. 10) of the Rule 11 allocution shows that Mr. Nunez, who completed an eleventh grade education and has the ability to read, write, speak and understand the English language, testified under oath that he had previously been employed to manage a grocery store, that he understood the *Pimentel* letter estimated his Sentencing Guideline range at not less than 87 months and not more than 108 months imprisonment, and that the *Pimentel* letter was not binding on the Court.

After explaining the charge and his rights to Defendant, the Magistrate Judge requested a proffer from the Government. Assistant United States Attorney Jeffrey A. Udell stated in relevant part as follows:

> The elements of the crime of conspiracy to violate the money-laundering laws are two: First, the existence of an illegal agreement to violate the money-laundering laws; and secondly, that the Defendant joined in that agreement, knowing its purpose and with an intent to further its illegal goals.

The Government offered to prove both those elements beyond a reasonable doubt through the testimony of "several law enforcement officials who observed Mr. Nunez on April 15, 2003...as he received a duffel bag from another individual, placed it into his car. In that duffel bag was

3

approximately $600,000...the officers followed Mr. Nunez, questioned him, searched the car on his consent and also searched his home where they found an additional $400,000 in cash and some notebooks and writings evident evincing drug and/or money-laundering transactions, evidence of money-laundering and drug transactions." He also informed the Magistrate Judge that at a trial, the government would "introduce statements made by Mr. Nunez at the time of his arrest in which he acknowledged that he was aware that the monies that were found by the government were derived from drug-trafficking proceeds." Defendant did not take issue with the proffer.

Later in the proceedings, the Magistrate Judge asked the Defendant "tell me in your own words what you did in connection with this case." After conferring with counsel, Mr. Nunez replied:

> On the morning of April 15th, I went - - and actually in the early afternoon, I went and picked up a suitcase of money. I was supposed to give it to somebody else but I never got to him. In the afternoon, I got another call to go pick up more money and that's when I got arrested.

He added that these events occurred in 2003 and took place in the Mobil Station on the Major Deegan Expressway in Yonkers.

The following questions were asked by the Magistrate Judge:

Q: Now, some people who knew some people were involved in drug-dealing and in moving money that was involved in drug-dealing. Is that right?

A: No, I thought the money came from drugs.

Q: You thought it came from drugs?

4

A: Yes.

Q: And thinking it came from drugs, you were going to help these people to move this money. Is that right? What did you think you were doing?

A: I was helping them move the money.

Q: And you were helping them move the money that you thought was involved in drug dealing.

A: Yes sir.

Q: In order to do that, you went to a gas station and you picked up a couple of duffel bags or suitcase first. Is that right?

A: Yes sir.

Q: How much money was in the suitcase approximately?

A: $470,000.

Q: What did you do with the suitcase?

A: I couldn't find who I was supposed to give it to so I had to put it in my house.

Q: Later that day, you got another call from these people you were helping?

A: Yes sir.

Q: And you went back to this gas station?

A: Yes sir.

Q: And what happened there?

A: They gave me two duffel bags.

Q: What was in the duffel bags?

A: $600,000.

Q: Was that also money that came from drug dealing?

A: I think, I suppose it was.

Q: What happened, what was your basis for supposing that it was?

A: They never told me it was from drug dealing and I never asked.

Q: Did you know that the people you were dealing with were involved in drug dealing, though?

A: It doesn't take a rocket scientist to see, but they never told me, they never actually told me.

He conceded thereafter that he was motivated to do this because he needed the money and
that the persons were paying him $5,000.00.

The Magistrate Judge concluded the proceedings and recommended acceptance of the plea. This Court thereafter did so, based on its reading of the transcript of the hearing of May 28, 2003. See Order dated June 9, 2003 (Doc. 11).

Thereafter, a Presentence Report (PSI) was prepared and submitted under date of July 30, 2003. The Probation Officer found the same Guideline range and computation as was set forth in the *Pimentel* letter. Counsel for the Defendant objected to the PSI by letter dated August 11, 2003. His Objection One was accepted by the Probation Officer. In Objection Two, Defendant contended that he should be afforded a three-level reduction in the Sentencing Guideline

computation for an uncompleted conspiracy, pursuant to § 2X1.1. The Probation Officer disagreed and wrote in response: "This reduction is not proper because had it not been for his apprehension the defendant would have completed all of the acts necessary to launder the money. In fact, it could be argues (sic) that Nunez did successfully launder the money when he took possession of it."

As Objection Three to the PSI, Defendant contended he was "entitled to a role reduction for being a minimal or minor participant in the offense, pursuant to § 3B1.2." The Probation Officer's response was: "Nunez is only being held accountable for the money he laundered, which was actually recovered from his vehicle and his home. Therefore, it does not appear that this reduction is appropriate for this defendant, as he is in essence claiming to a minor participant in his own criminal activity. It is the position of the Probation Department that the defendant played an important and essential role in the laundering of $1,063,493.00 in narcotics proceeds. Furthermore, we have only defendant's own self-serving account of his role in the offense."

As Objection Four, Defendant asserted that he lacked the requisite knowledge or belief that the money was narcotics proceeds and objected to the six point enhancement under § 2S1.1(b)(1). In response, the Probation Officer wrote: "The probation department disagrees. Based upon the defendant's post-arrest statements and plea allocution, we believe that Nunez knew that the funds involved in the scheme were narcotics proceeds."

Thereafter, on October 17, 2003, the Defendant appeared with counsel before this Court for sentence. The same issues which were the basis for the objections to the PSI were argued in

full at the sentencing hearing, generating more than forty pages of transcript. On the issue of when and where the money was to be delivered to the next intended recipient, defense counsel responded:

> But my client has testified that the process was, he had to call this person and then they had to set up a meet somewhere, and he didn't even get through on the first initial phone call. With respect to the second money shipment, there was never even a call made.

Counsel conceded that Nunez was not going to keep the money. Implicit in the fact situation is that he would make a second call to the intended person, or that the intended person knowing that Nunez was in possession of more than a million dollars of ill-gotten gains, not his own, would have initiated communication with him.

Counsel also argued at sentencing that the six-level guideline enhancement because he "knew or believed" the funds involved were drug proceeds was inappropriate. The Court responded at the time (Tr. at 12):

> There are many things in life that we believe based on hearsay. We believe things based on inference. We believe things because in the words of your client which I regard as eminently truthful, it didn't take a rocket scientist to know it was drug money, so he believed it was drug money. He admits it on his allocution that he believed it. He didn't know it, but it didn't take a rocket scientist to figure it out and he was not a rocket scientist...I am suggesting to you that the literal interpretation of [the Guideline Section] is permissible and that the word "believed" includes those things which you understand to be true but you haven't seen it with your own two eyes.

Counsel argued that "Nobody told him and he never asked." (Tr. at 15). This Court responded at the time "He never asked because he believed that the answer would be, 'Of course, it's drug money, what do you think it is?'" The Court also pointed out (Tr. at 16). "They [the Guidelines]

8

only require that you believe. There are lots of things we believe in that we can't prove."

This issue is attenuated somewhat by the concession at the allocution that "there was notebooks and writings that in the Government's expert testimony that we would call would show evinced drug and money laundering type of transactions. These were found at the Defendant's home, ledgers, if you will." (Tr. at 25) On the issue of belief versus knowledge, the Court addressed defense counsel (Tr. at 27):

> I believe you to be a lawyer. I have never seen your Certificate of Admission All the surrounding circumstances of your appearance make me think that you're a member of the Bar. The competence with which you approach these issues tells me that you have a legal education and that you are regularly working in these fields, but I don't know it. I believe it...That's as good an example that I can think of without taking a religious example."

The Court imposed sentence stating its agreement with the opinions and responses of the Probation Officer and the United States Attorney concerning the objections to the Guideline computations.

Following the imposition of sentence, defendant appealed. By an Order dated April 28, 2005, but no Mandate received in this Court until August 29, 2005, the Court of Appeals "remanded to the district court for further proceedings in conformity with *Crosby*." The Order also holds:

> We remand prior to considering the merits of appellant's challenge to the denial of a sentencing adjustment pursuant to U.S.S.G. § 2X1.1. While we express no opinion on the proper resolution of that challenge, we note that it involves several complex questions, including (1) whether the defendant-appellant's actions constituted a "completed" conspiracy, (2) whether the same actions established that a conspiracy was "about to be completed," and (3) whether the defendant-appellant's conduct establishes a conspiracy of the sort alleged in his indictment.

9

It would be premature for us to resolve these questions at this time.

*Discussion*

We begin our discussion of the merits of the *Crosby* motion for resentencing, by observing that the sentence initially imposed was not informed or controlled by the Guidelines, that is to say it was neither at the bottom of the Guideline range nor at the top. The Court regarded the sentence as imposed as reasonable to satisfy all of the statutory criteria of § 3553(a) of Title 18, and found that "This is sort of a mainstream or so-called heartland case and that the proper sentence ought to be imposed in the mid-range of the Guidelines...Indeed, this is a typical case, typical of the kind of money-laundering that's an essential part of the international drug conspiracies which cause so much difficulty and harm in our society."

More than implicit in the Order on remand, is an invitation for the Court to reconsider the above issues all of which were decided when sentence was imposed based on this Court's reasoning set forth in the transcript of the sentencing hearing.

We reconsider them now.

Paragraph (h) of § 1956 imports to this case the well-known concept of conspiracy articulated in 18 U.S.C. § 371, and described by Judge Learned Hand as the "darling of the prosecutor's nursery." More than a century of jurisprudence exists as to this crime. The only elements of the crime of conspiracy are (1) the agreement of two or more persons to act together

to commit a federal crime; (2) following which one or more of them do an [overt] act to effect an object of the conspiracy. The plea allocution in this case satisfies both these elements. Two overt acts are charged in paragraph 5 of the Information, each of which were conceded by the defendant in his allocution and were part of the uncontradicted proffer of proof by the government at the plea hearing. The existence of two or more people, in this case three members, is clearly shown in the allocution. A person who qualifies as a co-conspirator, referred to for convenience as A, instructed or agreed with Nunez (B) that Nunez would pick up the money for purpose of transferring it to a third person, referred to for convenience as C, for which he was to receive $5,000.00 for less than an hour's work. A had instructed Nunez how to reach C by telephone to set up the turnover. A single effort on his part to do so resulted in a failure to reach C. Nonetheless, there is no doubt that C exists, and thus there are three persons shown to exist as conspirators. They are Nunez himself, the person who hired and instructed Nunez to do the laundering transaction, and the intended recipient. It is not an essential element of the crime of conspiracy that Nunez knows the identity of C. It is enough that he exists and is committing the crime of conspiracy. It was clearly Nunez's intention to deliver it and not to keep it for himself. Because the conspiracy had at least three members including Nunez, none of whom was a federal agent, Wharton's Rule is not implicated in this case.

Wharton's Rule, not raised in the prior proceedings in the District Court, prevents a conspiracy conviction in a case where only two members of the alleged conspiracy exist, and the participation of both is necessary for the substantive criminal object of the conspiracy to be accomplished. Wharton's Rule traditionally is applied to crimes such as adultery, bigamy, incest

11

and dueling, where agreement to commit the crime is necessary to its accomplishment. The Rule, which takes its name from English text writer Francis Wharton (1820-1889) has been held to have "vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary" *Iannelli v. United States,* 420 U.S. 770, 782 (1975). *Iannelli* holds the Rule inapplicable to a violation of 18 U.S.C. § 1955, a provision of the Organized Crime Control Act of 1970 directed against large scale gambling activities, based on a finding of Congressional intent to retain both the conspiracy offense and the substantive offense as "an 'independent curb' available for use in the strategy against organized crime." *Id* at 791. The same analysis applies in equal force to money-laundering prosecutions. This conclusion is reinforced by the presence in the statute of § 1956(h). Accordingly, assuming for the argument, and against all common sense that "C", in Nunez case is not a co-conspirator who is also committing a crime, but rather some dull-witted banker or innocent facilitator, Wharton's Rule as presently understood would not prevent a conspiracy prosecution.

The next issue is whether for purposes of Guideline issues only, having nothing to do with the elements of the crime, Nunez was entitled to a three-level downward adjustment under § 2X1.1(b)(2). The government argues correctly that by accepting delivery of the money, he completed the money-laundering offense that was the object of the conspiracy. Alternatively, in any event, the record is clear that the conspirators did not intend that Nunez keep the money for any length of time or permanently. He kept part of the money at his home for the remainder of a day because he could not reach by telephone the person to whom he was instructed to deliver it. Nunez had not given up on finding him. There is every reason in the world to believe

12

that if not arrested, he would have attempted the phone call again, or the intended recipient of the money would have contacted Nunez. Under these facts is at least clear that the only reason the intended transfer or delivery of the money regarded as necessary to obviate the Guideline adjustment did not take place was the intervention of law enforcement authorities and arrest of Nunez which prevented him from completing this transaction. He was about to complete the underlying crime, within a day or two at most and would have done so but for interruption by an event beyond the conspirators' control.

This Court adheres to its finding on the original sentence proceeding that the money laundering offense was accomplished fully with Nunez's receipt of the money and concludes alternatively, and within the meaning of § 2X1.1, the crime was in the course of completion, in that he was about to deliver the money and would have done so but for the arrest. The Court noted at the time of sentence and continues to believe that "the about to deliver concept can be a matter of days or even weeks, so long as the crime is in the course of being completed." (Sentence Tr. at 35). See generally *United States v. Velez,* 357 F.3d 239, 240-42 (2d Cir. 2004). We note in passing that it is the will of Congress expressly stated in subparagraph (h) that a person convicted of conspiracy "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the conspiracy." This Court concludes that the defendant as a matter of law is not entitled to the § 2X1.1 adjustment.

The next issue is whether for Guidelines purposes, Mr. Nunez "knew or believed," within § 2S1.1(b)(1) that the funds he laundered were narcotics proceeds. The Court adheres to its

13

extensive analysis of this point at the time of sentence, quoted earlier.  He knew.  If indeed he

did not know, at least he believed.  In any event, Nunez presents a classic case of conscious

avoidance within *United States v. Finkelstein*, 229 F.3d 90, 97 (2d Cir. 2000).


As a separate issue, a role reduction adjustment is unwarranted in the case, for the

reasons

noted by the Probation Office in responding to Defendant's objections to the PSI.


The Court declines most respectfully the invitation contained in the footnote in the

Mandate to "consider the Guidelines by noting the two Guidelines ranges facing Nunez (one

with a § 2X1.1 adjustment, and one without such an adjustment), and after considering those

ranges, elect to provide a "non-Guidelines" sentence, but not ultimately relying in whole on

either of the two guidelines ranges when providing a reasonable sentence.


This Court has reconsidered the original sentence imposed on Mr. Nunez, treating the

Guidelines as advisory only.  The original sentence is reasonable and in this Court's opinion

satisfies all the statutory criteria of 18 U.S.C. § 3553(a).  It would have been imposed by the

Court under an advisory regime, and is adhered to.


However, the Court is unable to state with confidence that it would have imposed the

same sentence if, as argued by Defendant, the advisory Guidelines only called for a sentence

within the range of 63 to 78 months.  While our Court of Appeals in *Crosby,* at 397 F.3d 103,

14

113 (2d Cir. 2005) declined to determine what degree of consideration of the now advisory Guidelines is required, and declined also to "prescribe any formulation a sentencing judge will be obliged to follow in order to demonstrate discharge of the duty to 'consider' the Guidelines" or require "'robotic incantations' by district judges," it is clear that the Guidelines remain more than

"a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. . .On the contrary the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all [statutory] factors." *United States v. Godding,* 40 F.3d 125, 126 (2d Cir. 2005) (quoting and citing *Crosby).*

All other contentions of Defendant have been considered and rejected.

Resentencing is denied for the reasons noted above.

X

    X

        X

           X

SO ORDERED.

Dated: White Plains, New York
      May 5, 2006

                                                    Charles L. Brieant, U.S.D.J.